# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-IA-00767-SCT

*UNITED EMERGENCY SERVICES OF*
*MISSISSIPPI, INC., AND KEITH E. McCOY, M.D.*

*v.*

*OLIVER MILLER, ON BEHALF OF THE*
*WRONGFUL DEATH BENEFICIARIES OF*
*SHANNON REED*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/23/2023 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | BRADFORD KEITH MORRIS |
| | LEO JOSEPH CARMODY, JR. |
| | DAVID W. UPCHURCH |
| | JOHN MARK McINTOSH |
| | GAYE NELL LOTT CURRIE |
| | D. COLLIER GRAHAM, JR. |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | D. COLLIER GRAHAM, JR. |
| | GAYE NELL LOTT CURRIE |
| ATTORNEY FOR APPELLEE: | BRADFORD KEITH MORRIS |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART; AND REMANDED - 04/24/2025 |
| MOTION FOR REHEARING FILED: | |

## CONSOLIDATED WITH

## NO. 2023-IA-00772-SCT

*BAPTIST MEMORIAL HOSPITAL-GOLDEN*
*TRIANGLE, INC.*

**v.**

*OLIVER MILLER, ON BEHALF OF THE*
*WRONGFUL DEATH BENEFICIARIES OF*
*SHANNON REED*

DATE OF JUDGMENT:           06/23/2023
TRIAL JUDGE:                  HON. JAMES T. KITCHENS, JR.
COURT FROM WHICH APPEALED:   LOWNDES COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:     LEO JOSEPH CARMODY, JR.
                                DAVID W. UPCHURCH
                                JOHN MARK McINTOSH
ATTORNEY FOR APPELLEE:       BRADFORD KEITH MORRIS
NATURE OF THE CASE:          CIVIL - WRONGFUL DEATH
DISPOSITION:                  AFFIRMED IN PART; REVERSED AND
                                RENDERED IN PART; AND REMANDED -
                                04/24/2025
MOTION FOR REHEARING FILED:

**BEFORE COLEMAN, P.J., MAXWELL AND BRANNING, JJ.**

**COLEMAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    On behalf of the wrongful-death beneficiaries of Shannon Reed, Oliver Miller brought medical negligence claims against Baptist Memorial Hospital-Golden Triangle, United Emergency Services, and Dr. Keith McCoy in the Circuit Court of Lowndes County, Mississippi. Baptist, United, and Dr. McCoy filed motions for summary judgment, arguing that Miller's medical negligence claims failed as a matter of law for lack of causation. The circuit court found genuine issues of material fact for the jury's determination and denied summary judgment. The Court granted Baptist, United, and Dr. McCoy's petition for interlocutory appeal on the narrow issue of whether genuine issues of material fact exist as

2

to causation. We affirm the circuit court's denial of summary judgment in part, and we reverse and render in part. The case is remanded to the Lowndes County Circuit Court for further proceedings.

## BACKGROUND

¶2. On April 26, 2018, around 7:30 p.m., Shannon Reed arrived at the Baptist emergency room reporting severe chest pain, nausea, shortness of breath, and numbness in his left arm. Reed initially stated that he experienced eight out of ten pain while exercising but that the pain had reduced to a three out of ten after arriving at the hospital. Reed had a history of hypertension, failure to take medication, tobacco use, and Tourette's syndrome. Reed had previously visited Baptist on August 2, 2016, for similar symptoms and received an electrocardiogram (EKG).

¶3. Upon Reed's arrival on April 26, 2018, Dr. McCoy ordered an EKG, a chest X-ray, a Troponin measurement, and a follow-up Troponin level check ninety minutes later. At 8:15 p.m., Dr. McCoy ordered a second EKG and then a third at 9:37 p.m. when Reed's pain increased to a nine out of ten. All three EKGs were interpreted as "nonspecific." Reed's chest pain eventually subsided, and Dr. McCoy initiated Reed's discharge from the emergency room.

¶4. Prior to his discharge, Reed informed his nurse, Danielle Oakes, that his pain had increased to a six out of ten at 10:21 p.m. No one informed Dr. McCoy of the pain increase, and Reed was discharged from the hospital "with a diagnosis of unspecified chest pain that was possibly related to muscle strain from over-exertion and uncontrolled hypertension."

3

Further, Reed was prescribed several medications and was instructed "to follow up with a cardiologist within 1 week and avoid boxing or heavy lifting." Reed died during the night following his discharge.

¶5.     Oliver Miller, Reed's father, subsequently filed several medical negligence claims in the Lowndes County Circuit Court against Baptist, United, and Dr. McCoy on behalf of Reed's wrongful-death beneficiaries.  He alleged that Reed's death was proximately caused by the defendants' failures to properly monitor, diagnose, treat, and discharge Reed.  In support of the allegation, Miller presented the expert testimony of Dr. Kenneth A. Stein, Dr. Zia Ahmad, Registered Nurse Gregory Jones, and Dr. Paul Uribe.  Miller's experts described what they considered, in their professional opinions, various breaches in the standard of care that caused or contributed to Reed's death.

¶6.     In response, Baptist introduced affidavits of two of its employees, Dr. Joon Chang and Dr. John King, the on-call cardiologist and backup on-call cardiologist, respectively. In the emergency room, if Dr. McCoy sought to admit Reed, he would have been required to obtain Dr. Chang's or Dr. King's approval.  In their affidavits, both doctors attested that, after reviewing Reed's medical history and records, they would have taken the same measures as Dr. McCoy.  Further, even assuming Dr. McCoy had been notified of Reed's pain increase of six out of ten and had consulted with them, Drs. Chang and King attested that they, like Dr. McCoy, would not have admitted Reed to the hospital.

¶7.     Based on Dr. Chang's and Dr. King's testimony, Baptist, United, and Dr. McCoy maintain that any alleged breach in the standard of care would not have changed the outcome.

Thus, Baptist, United, and Dr. McCoy filed motions for summary judgment asserting that Miller's medical negligence claims failed for lack of causation.

¶8. Miller then filed an omnibus response in opposition to the motions for summary judgment, rebutting that his experts provided evidence of a *prima facie* case of negligence, or at a minimum, established a genuine issue of material fact for the jury. A hearing on the motions was later held on May 19, 2023. In its order entered on June 22, 2023, the circuit court denied the motions for summary judgment, finding that genuine issues of material fact existed. Baptist, United, and Dr. McCoy filed a petition for interlocutory appeal, which the Court granted.

## DISCUSSION

### I. Whether the circuit court erred by denying summary judgment.

¶9. "On appeal, the grant or denial of a motion for summary judgment is reviewed de novo, viewing the evidence 'in the light most favorable to the party against whom the motion has been made.'" ***Hardaway v. Howard Indust., Inc.***, 378 So. 3d 946, 951 (¶ 14) (Miss. 2024) (internal quotation marks omitted) (quoting ***Maness v. K & A Enters. of Miss., LCC***, 250 So. 3d 402, 409 (Miss. 2018)). "However, the nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial,' and cannot merely 'rest upon the mere allegations or denials of his pleadings.'" ***Williams v. City of Batesville***, 313 So. 3d 479, 482 (¶ 7) (Miss. 2021) (internal quotation marks omitted) (quoting ***Boroujerdi v. City of Starkville***, 158 So. 3d 1106, 1109 (Miss. 2015), *overruled on other grounds by* ***Wilcher v. Lincoln Cnty. Bd. of Supervisors***, 243 So. 3d 177 (Miss. 2018); M.R.C.P. 56(e)).

A *prima facie* case of negligence requires proof that

(1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant's breach of duty was a proximate cause of the plaintiff's injury; and (4) the plaintiff was injured as a result.

*Vaughn v. Miss. Baptist Med. Ctr.*, 20 So. 3d 645, 650 (¶ 15) (Miss. 2009) (quoting *McDonald Mem'l Hosp. at Gulfport*, 8 So. 3d 175, 180 (Miss. 2009)).

"[C]ausation is generally a matter for the jury." *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 340 (¶ 20) (Miss. 2004) (internal quotation marks omitted) (quoting *Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 174 (Miss. 1999)). The nonmoving party generally must establish medical negligence through expert testimony. *Johnson v. Pace*, 122 So. 3d 66, 68 (¶ 8) (Miss. 2013) (citing *Smith ex rel. Smith v. Gilmore Mem'l Hosp., Inc.*, 952 So. 2d 177, 180 (Miss. 2007)). "Not only must this expert identify and articulate the requisite standard that was not complied with, the expert must also establish that the failure was the proximate cause, or proximate contributing cause, of the alleged injuries." *Id.* (internal quotation marks omitted) (quoting *Barner v. Gorman*, 605 So. 2d 805, 809 (Miss. 1992)). Summary judgment should only be granted "when the moving party has met its burden by demonstrating that no genuine issues of material fact exist." *Id.* (¶ 7) (citing *Tucker v. Hinds Cnty.*, 558 So. 2d 869, 872 (Miss. 1990)).

¶10. On appeal, Baptist, United, and Dr. McCoy contend, in reliance on *Smith v. Hardy Wilson Memorial Hospital*, 300 So. 3d 991 (Miss. 2020), that summary judgment should have been granted because Miller failed to meet his burden of proof on the causation

6

requirement. Specifically, they assert that summary judgment was appropriate because Baptist's cardiologists would not have altered Reed's treatment, so any alleged negligence could not have caused Reed's death. According to Baptist, United, and Dr. McCoy, Miller cannot, as a matter of law, establish a *prima facie* case of medical negligence without proof of causation

¶11. In *Smith*, the estate and wrongful-death beneficiaries of the deceased patient, Carolyn Smith, filed suit alleging that multiple providers negligently caused or contributed to her death. *Id.* at 994 (¶ 6). One such claim was against the hospital, Hardy Wilson, and its nursing staff's alleged negligence. The plaintiffs presented the expert testimony of a nursing care expert who opined that Carolyn's attending nurses breached the standard of care by failing to take "affirmative action" to prevent her discharge. *Id.* (¶ 8).

¶12. There, we held that the plaintiff did not produce sufficient evidence of causation to support the claim. *Id.* at 999 (¶ 23). Specifically, the plaintiff's nursing expert opined that, had the nurses followed the standard of care, the plaintiff's decedent "would not have been discharged[.]" *Id.* at 997-98 (¶ 18). We affirmed the trial court's grant of summary judgment because the plaintiff had no proof that, had the nurses performed as the nursing expert opined they should, she indeed would not have been discharged.

> The Smiths did not present any proof that an administrator with the authority to overrule the doctor or an on-call physician with the same power even existed, much less that either of those individuals would have overruled Dr. Johnson's decision to discharge Carolyn. Hardy Wilson asserts in its brief, seemingly without contest, that no such personnel were available. More importantly, the record does not contain any evidence that said personnel were or should have been available, a vital link in establishing causation under this

claim. We would literally have to assume, with no evidence, that such personnel existed and would act accordingly.

Additionally, the record contains no proof that Dr. Johnson would have changed his mind when faced with opposition from the nurses. To be sure, the Smiths' physician experts opine that Dr. Johnson violated the standard of care by discharging Carolyn. But neither Dr. Dale nor Dr. Stodard aver that persistence by the nurses after Dr. Johnson's final decision to discharge would have resulted in a different decision. They are the only experts presented who could testify as to what the doctor should have done with or without intervention by the nurses. Based on our review, the record affirmatively shows that despite the nurses' communicating Carolyn's condition to Dr. Johnson, he nonetheless chose to discharge her. In fact, all three of the Smiths' proffered experts acknowledge and the Smiths repeatedly concede that the nursing staff fully informed Dr. Johnson of Carolyn's vital signs, that Dr. Johnson had the nurses recheck the vital signs after they had taken a turn for the worse to confirm the numbers and that it was still Dr. Johnson's decision to discharge Carolyn.

*Id.* at 998 (¶¶ 20-21).

¶13.    Thus, Baptist, United, and Dr. McCoy urge that "[i]t is well established Mississippi law that where no evidence that a different course of treatment would have ensued absent the alleged negligence which would have more likely than not resulted in a patient's survival, the defendant's alleged negligence cannot be a cause in fact of the death." (citing *Smith*, 300 So. 3d at 997 (¶ 17)).  Because the on-call cardiologists stated they would not have taken a different course of action, they assert that neither Dr. McCoy nor the hospital staff could have been a cause in fact of Reed's death.

¶14.    Baptist, United, and Dr. McCoy also cite *Mississippi Baptist Health Systems v. Harris*, 320 So. 3d 484, 488 (¶ 18) (Miss. 2021), where, similar to *Smith*, the Court held that the plaintiffs failed to establish an issue of fact because their medical expert did not show

8

that the doctor "would have acted differently had he been informed by the nursing staff of [the deceased patient's] continued pain."

¶15. Here, after reviewing the autopsy findings and Reed's medical records, Reed's expert Dr. Stein concluded that "within a reasonable degree of medical probability had Mr. Reed been admitted to the hospital on the evening of April 26th, 2018, he would have been properly monitored, appropriately treated and would not have died. . . ." Dr. Stein stated that, based on Reed's medical history, he "was at high risk for a major cardiac event or other major illness" and that Dr. McCoy should have admitted Reed to the hospital.

¶16. However, we agree with Baptist, United, and Dr. McCoy that Miller fails to make a *prima facie* case of medical negligence on his claim that Dr. McCoy failed to admit Reed to the hospital. Specifically, consistent with *Smith*, Miller failed to meet the causation element by showing that the on-call cardiologist would have admitted Reed into the hospital. Dr. McCoy did not have admitting privileges, so he would have needed to consult the on-call cardiologist to admit Reed. As in *Smith*, affidavits in the record from the cardiologist on-call and another cardiologist provide that, even if the on-call cardiologists had been consulted about admission, they would not have admitted Reed. *Smith*, 300 So. 3d at 998 (¶ 21). As such, Miller fails to show Dr. McCoy would have pursued a different course of treatment if they had been consulted, and he therefore fails to show the alleged negligence was a cause in fact of Reed's death. Therefore, the circuit court erred by not granting summary judgment on the theory that Dr. McCoy failed to admit Reed to the hospital.

¶17. Conversely, we affirm the circuit court's denial of summary judgment on all of Miller's other claims, discussed below, because, as to those claims, Miller made a *prima facie* case of medical negligence. While it is true that "the question as to whether or not the opinion of an expert is based on, and supported by sufficient facts or evidence to sustain it, is a question of law for the court[,]" **Smith**, 300 So. 3d at 998 (¶ 22) (internal quotation marks omitted) (quoting **Gulf Ins. Co. v. Provine**, 321 So. 2d 311, 314 (Miss. 1975), it is evident, as the circuit court implicitly found, that Miller's experts presented sufficient facts and evidence to sustain their opinions.

¶18. Dr. Stein also found issue with Reed's discharge instructions, asserting that "it would be unreasonable for an emergency medicine physician to expect that Mr. Reed would be able to be evaluated by a cardiologist within 1 week." Dr. Stein concluded his testimony by providing specific breaches of the standard of care that, in his opinion, "were major contributing factors" to Reed's death:

1. Failing to compare the EKGs obtained on April 26th, 2018 with the EKG obtained on August 2nd, 2016.

2. Incorrectly interpreting three EKGs obtained on April 26th as showing "nonspecific changes" when they actually showed changes suggestive of ischemia to the inferior (lower) aspect of the heart.

3. Incorrectly interpreting the 2nd and 3rd EKG's obtained on April 26 as being similar to the first EKG obtained on that date when in fact there were changes between the EKGs.

4. Not contacting a cardiologist, hospital or primary care physician to admit Mr. Reed to the hospital on April 26th 2018.

5. Discharging Mr. Reed from the hospital with instructions to follow up with the cardiologist within seven days.

10

¶19.    Dr. Stein also identified Nurse Oakes's failure to inform Dr. McCoy of Reed's pain increase as another breach in the standard of care that caused or contributed to Reed's death. Lastly, Dr. Stein noted,

> [i]f Dr. McCoy had been informed that Mr. Reed's pain was 6/10 at 10:21 PM and allowed him to be discharged despite this, this was a further breach of the standard of care on the part of Dr. McCoy. Within a reasonable degree of medical probability, this breach of the standard of care caused or contributed to cause Mr. Reed's death on the night of April [26th] / morning of April 27, 2018.

Taking the above-quoted opinion as true and in a light most favorable to the plaintiff, Dr. Stein has given a competent expert opinion that Dr. McCoy breached the standard of care by not holding Reed longer and that the failure to hold him caused his death. The failure to hold does not mean the same thing, at least given the standard applicable to a motion for summary judgment, as admission to the hospital.

¶20.    Additionally, Baptist, United, and Dr. McCoy claim that Miller failed to prove the causation requirement necessary to make a *prima facie* case of medical negligence on his claim that the nurse was negligent by failing to report Reed's pain increase to Dr. McCoy. They claim no causation exists because Dr. McCoy testified that had he been consulted, he would not have admitted Reed or held him longer, but that is an inaccurate portrayal of Dr. McCoy's testimony.

¶21.    Dr. McCoy specifically testified that had he been notified of the pain increase, he "would have gone back in the room and talked to the patient." He stated that he would have collected more information about where the pain was coming from, along with its nature and quality, and then he would have compared it to the information already collected. Dr. McCoy

11

also testified that, based on his reevaluation of Reed's pain, he would have determined whether to conduct another EKG. Under *Smith*, Miller has produced evidence showing that, "but for the defendant's negligence, the injury would not have occurred" because Dr. McCoy proffered that he would have pursued a different course of treatment absent the alleged negligence. *Smith*, 300 So. 3d at 997 (¶ 17). As such, viewing the evidence in the light most favorable to Miller, Miller made a *prima facie* showing of medical negligence on the aforementioned claim.

¶22. Dr. Ahmad stated that her "review of the medical records of Mr. Shannon Reed revealed many missed opportunities and oversights which resulted in care that did not meet the standard of care resulting in the unfortunate outcome." She opined that the standard of care for patients with symptoms and similar medical history "is hospitalization for observation, further diagnostic tests and aggressive treatment." Dr. Ahmad further listed various treatments that should have been undertaken but were not. She also noted that, in her opinion, Dr. McCoy and the nursing staff incorrectly interpreted the EKGs, failed to properly communicate Reed's symptoms, and inappropriately treated Reed's pain fluctuations, all of which constituted deviations from the standard of care. Dr. Ahmad concluded as follows:

> All of the above were deviations from the accepted norms and practices in patients with clinical presentations as above. These represented breaches of standard of care. To a reasonable degree of medical certainty it is my opinion that these breaches in the standard of care caused or contributed to the death of Mr. Shannon Reed.

12

Finally, Dr. Uribe, a forensic pathologist, reviewed Reed's medical history and autopsy report and attested that in accordance with Dr. Ahmad's findings, Reed would likely have survived but for the improper "diagnosis, intervention and treatment."

¶23.    In sum, Miller maintains that his experts have clearly established a *prima facie* case of negligence by providing evidence that

> [The] standard of care violations by both Dr. McCoy and Nurse Oakes resulted in systemic failure at [Baptist's] emergency department during the care of Mr. Reed; that EKG results were misinterpreted and not compared to prior results; that the timing of the serial troponin testing was not performed consistent with hospital policy and generally accepted standards of care; that standard of care required Mr. Reed be kept at the hospital for additional monitoring, testing, and interventions; that important information of changes in Mr. Reed's pain level prior to discharge was not communicated by Nurse Oakes to Dr. McCoy; and the improper, untimely discharge of Mr. Reed proximately caused or contributed to his death.

¶24.    Based on the above, we conclude that Miller's experts presented sufficient evidence of multiple breaches in the standard of care that caused or contributed to Reed's death.

¶25.    United and Dr. McCoy also contend that Miller's experts provided "no real facts" that, under the "loss-of-chance-recovery" doctrine, Reed would have had a greater than 50 percent chance of survival. "To recover under this theory, the plaintiff must prove that, but for the physician's negligence, he or she had a reasonable probability of a substantial improvement." *Mem'l Hosp. at Gulfport v. White*, 170 So. 3d 506, 508 (¶ 11) (Miss. 2015) (citing *Clayton v. Thompson*, 475 So. 2d 439, 445 (Miss. 1985)).

¶26.    United and Dr. McCoy liken the present case to *Hubbard v. Wansley*, 954 So. 2d 951, 965-66 (¶ 48) (Miss. 2007), in which the Court held that the plaintiff failed to make a viable loss-of-chance claim because her expert opinion was "almost wholly conclusory on the issue

13

of causation and gives very little in the way of specific facts and medical analysis to substantiate the claim that Hubbard had a greater than fifty percent chance of substantial recovery . . . ."

¶27.  Again, Miller's experts provided competent evidence showing that Reed's death would have been prevented had the requisite standards of care been followed relating to (1) observation, monitoring, and intervention, (2) Reed's past medical history, (3) interpreting the EKGs, (4) conducting the Troponin tests, (5) reporting Reed's pain increase, and (6) the timeliness and instructions concerning Reed's discharge.  Miller asserts that if Dr. McCoy had properly interpreted the EKGs, completed the Troponin testing in accordance with Baptist's policy, conducted additional testing or administered medication consistent with Reed's symptoms and previous medical history, then Reed more likely than not would have survived.

¶28.  Thus, we agree with Miller that, unlike in *Hubbard*, Miller's experts provided sufficient facts and analysis to support loss-of-chance recovery rather than "wholly conclusory" statements on causation.  *Id.*  Miller presented competent expert testimony that, but for the alleged failures listed above, Reed had a reasonable probability of survival, or at the very least, the expert testimony established an issue of fact reserved for the jury.

¶29.  Excluding Miller's claims that rely on the theory that Dr. McCoy should have admitted Reed into the hospital, we conclude that the plaintiff has made a *prima facie* case of medical negligence and has shown the existence of triable issues of fact as to causation. As discussed above, Baptist's expert opinions clearly create at least one factual issue for the

14

jury: Baptist's experts contend that Reed's death was unavoidable, and Miller's experts assert the opposite. "When reasonable minds might differ on the matter, questions of proximate cause and of negligence" are generally for the jury to decide. *Rein v. Benchmark Constr. Co.*, 865 So. 2d 1134, 1144 (¶ 31) (Miss. 2004) (citing *Hankins Lumber Co. v. Moore*, 774 So. 2d 459, 464 (Miss. Ct. App. 2000)).

## CONCLUSION

¶30.    Viewing the evidence in the light most favorable to Miller, we conclude there are genuine issues of material fact for the jury's determination on Miller's claims except claims that rely on the theory that Dr. McCoy should have admitted Reed to the hospital. Therefore, we reverse and render summary judgment in favor of Baptist, United, and Dr. McCoy to the extent that Miller claims they were negligent for not admitting Reed to the hospital, and we affirm the circuit court's denial of summary judgment on Miller's remaining claims. The case is remanded to the Circuit Court of Lowndes County for further proceedings.

¶31.    **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; AND REMANDED.**

**RANDOLPH, C.J., KING, P.J., MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**

15